*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

───────────────

**UNITED STATES**
Appellee

**v.**

**Robert B. BERGDAHL, Sergeant**
United States Army, Appellant

**No. 19-0406**

Crim. App. No. 20170582

Argued June 2, 2020—Decided August 27, 2020

Military Judges: Christopher T. Fredrikson
and Jeffery R. Nance

For Appellant: *Eugene R. Fidell*, Esq. (argued); *Major Matthew D. Bernstein*, *Sean T. Bligh*, Esq., *Christopher L. Melendez*, Esq., *Stephen A. Saltzburg*, Esq., and *P. Sabin Willett*, Esq. (on brief).

For Appellee: *Captain Allison L. Rowley* (argued); *Lieutenant Colonel Wayne H. Williams* and *Major Jonathan S. Reiner* (on brief); *Major Catharine M. Parnell*.

Amicus Curiae for Appellant: *Joshua E. Kastenberg*, Esq., and *Rachel E. VanLandingham*, Esq. (on brief).

Judge OHLSON delivered the opinion for a unanimous Court with respect to Part I, and the opinion of the Court with respect to Parts II.A. and II.B., in which Chief Judge STUCKY, Judge SPARKS, and Senior Judge RYAN, joined, and the opinion of the Court with respect to Parts II.C. and III, in which Judge MAGGS and Senior Judge RYAN joined. Judge MAGGS filed an opinion concurring in part and concurring in the judgment. Chief Judge STUCKY filed an opinion concurring in part and dissenting in part. Judge SPARKS filed an opinion concurring in part and dissenting in part, in which Chief Judge STUCKY joined.

───────────────

Judge OHLSON delivered the opinion of the Court.

On June 30, 2009, in Paktika Province, Afghanistan, Appellant, who was then a soldier in the United States Army, intentionally walked away without authority from his combat observation post which it was his duty to defend. Appellant's decision to leave his post can be attributed, at least in part, to

the state of his mental health. *See infra* Part II.C. Specifically, Appellant erroneously came to believe that poor leadership in his battalion put his platoon at risk of being sent on a suicide mission. In order to report his concern, Appellant decided to abandon his post and walk approximately twenty miles through hostile territory to reach an American forward operating base. Appellant correctly surmised that upon his disappearance the military would launch a massive search effort. Appellant further believed that when he arrived at his destination he would be presented to the commanding general as the missing soldier for whom the military was searching, and he then would have the opportunity to discuss directly with the general the supposed plight of Appellant's platoon. However, the actual consequences of Appellant's desertion were far different from what he had imagined. Soon after abandoning his post, Appellant was captured by the Taliban, held captive for five years under abominable conditions, exchanged for five members of the Taliban who were detainees at Guantanamo Bay, and prosecuted for his misconduct.

At court-martial, Appellant pleaded guilty to desertion with intent to shirk hazardous duty and to misbehavior before the enemy in violation of Articles 85 and 99, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 885, 899 (2012). The military judge sentenced Appellant to a dishonorable discharge, reduction to the grade of E-1, and forfeiture of $1,000 per month for ten months.

During his court-martial and then on appeal, Appellant argued that public comments made by President Donald Trump, both when Mr. Trump was a candidate for president and after he became Commander in Chief, and by the late Senator John McCain when he served as chairman of the Senate Armed Services Committee, resulted in an appearance of unlawful command influence. An appearance of unlawful command influence arises in a case when an "intolerable strain" is placed on the public's perception of the military justice system because "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (internal quotation marks omitted) (quoting *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)). Appellant asks this

Court to dismiss with prejudice the charges and specifications against him, or in the alternative, to grant other meaningful relief such as approving a sentence of no punishment.[1] We decline to do so.

To be sure, at sentencing Appellant submitted substantial mitigating evidence for consideration. *See infra* Part II.C. However, it is essential to note that the conduct Appellant engaged in, and the charges to which he pleaded guilty, were very serious offenses for which either a life sentence or the death penalty were authorized punishments. *See* Articles 85(c), 99(9), UCMJ. Moreover, these offenses were anathema to the military and its mission. And importantly, as a direct and foreseeable consequence of Appellant's misconduct, other members of the armed forces were injured—some severely— while seeking to find and rescue Appellant. *See infra* Part II.C. In light of these facts, it is wholly unrealistic to believe there was any scenario where: (1) upon his return to the United States, Appellant would not have been held accountable at a general court-martial for his offenses (to which he voluntarily pleaded guilty); and (2) Appellant would not have received the dishonorable discharge he himself subsequently requested.

Thus, simply stated, it was the totality of the circumstances surrounding Appellant's misconduct rather than any outside influences that foreordained the Army's handling and disposition of this case. Therefore, an objective, disinterested observer would not harbor any significant doubts about the ultimate fairness of these court-martial proceedings. Accordingly, we hold that there was no appearance of unlawful command influence in this case, and we affirm the decision of the United States Army Court of Criminal Appeals.

---

[1] The granted issue is: "Whether the charges and specifications should be dismissed with prejudice or other meaningful relief granted because of apparent unlawful command influence." *United States v. Bergdahl*, 79 M.J. 307 (C.A.A.F. 2020) (order granting review).

**I. Applicable Law**

Both Article 37, UCMJ, 10 U.S.C. § 837 (2012), and Rule for Courts-Martial (R.C.M.) 104(a), prohibit unlawful command influence. Specifically, Article 37(a), UCMJ, states in pertinent part:

> No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts . . . .

Similarly—yet not identically—R.C.M. 104(a) provides:

> (1) *Convening authorities and commanders.* No convening authority or commander may censure, reprimand, or admonish a court-martial . . . or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court-martial . . . , or with respect to any other exercise of the functions of the court-martial . . . or such persons in the conduct of the proceedings.
> (2) *All persons subject to the code.* No person subject to the code may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case or the action of any convening, approving, or reviewing authority with respect to such authority's judicial acts.

There are two types of unlawful command influence that may arise in the military justice system: actual unlawful command influence and apparent unlawful command influence. Here, Appellant only raises the issue of apparent unlawful command influence and thus we examine the facts of this case solely in that context.

This Court reviews allegations of unlawful command influence de novo.[2] *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018) (citing *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013)). To make a prima facie case of apparent unlawful command influence, an accused bears the initial burden of presenting "some evidence" that unlawful command influence occurred. *Boyce*, 76 M.J. at 249 (internal quotation marks omitted) (quoting *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)). "This burden on the defense is low, but the evidence presented must consist of more than 'mere allegation or speculation.'" *Id.* (quoting *Salyer*, 72 M.J. at 423).

Once the accused meets the "some evidence" threshold, the burden shifts to the government to prove beyond a reasonable doubt that either: (a) the "predicate facts proffered by the appellant do not exist," or (b) "the facts as presented do not constitute unlawful command influence." *Id.* (citing *Salyer*, 72 M.J. at 423; *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)). If the government cannot succeed at this step, it must prove beyond a reasonable doubt that the unlawful command influence "did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would [*not*] harbor a significant doubt about the fairness of the proceeding." *Id.* at 249 (alteration in original) (internal quotation marks omitted) (citation omitted).

---

[2] Importantly, when employing de novo review, "the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings." *Black's Law Dictionary* 121 (11th ed. 2019) (defining "appeal de novo"); *see also, e.g.*, *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When *de novo* review is compelled, no form of appellate deference is acceptable."); *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168 (2d Cir. 2001) ("When we review a district court's decision *de novo*, we take note of it, and study the reasoning on which it is based. However, our review is independent and plenary; as the Latin term suggests, we look at the matter anew, as though the matter had come to the courts for the first time.").

## II. Analysis

## A. Ability to Commit Unlawful Command Influence

As a threshold matter, based squarely on the plain language of Article 22, UCMJ, 10 U.S.C. § 822 (2012), Article 37, UCMJ, and R.C.M. 104, we hold that Senator McCain was capable of committing unlawful command influence and that a sitting president of the United States is also capable of committing unlawful command influence.

### 1. Senator McCain

Article 37(a), UCMJ, prohibits any "person subject to [the UCMJ]" from "attempt[ing] to . . . influence the action of a court-martial." At the time of his public comments regarding Appellant's case, Senator McCain was a retired member of the United States Navy, and thus he was subject to the UCMJ pursuant to Article 2(a)(4), UCMJ, 10 U.S.C. § 802(a)(4) (2012).[3] We therefore hold that Senator McCain was capable of committing unlawful command influence.

### 2. A President of the United States

We hold that a sitting president of the United States is also capable of committing unlawful command influence. R.C.M. 104(a)(1) provides in part: "No convening authority . . . may censure, reprimand, or admonish a court-martial . . . ." Under the terms of Article 22(a)(1), UCMJ, a sitting president is *a* convening authority.[4] Thus, the plain language of R.C.M. 104(a)(1) encompasses *any* convening authority, and unlike Article 37, UCMJ, is not limited to the individual who convened the specific court-martial at issue.

In this regard, compare R.C.M. 104(a)(1) which states: "*No* convening authority . . . may censure, reprimand, or admonish *a* court-martial" (emphasis added), with Article 37(a), UCMJ, which states: "No authority *convening* a . . . court-martial may censure, reprimand, or admonish *the*

___

[3] Article 2(a), UCMJ, reads: "The following persons are subject to this chapter: . . . (4) Retired members of a regular component of the armed forces who are entitled to pay."

[4] Article 22, UCMJ, states: "(a) General courts-martial may be convened by— (1) The President of the United States . . . ."

court" (emphasis added).[5] Far from creating ambiguity, this difference in syntax signals a difference in meaning. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.").

Any suggestion that we should interpose additional language into a rule that is anything but ambiguous is the antithesis of textualism.[6] *See Black's Law Dictionary* 1779 (11th ed. 2019) (defining "textualism" as "[t]he doctrine that the words of a governing text are of paramount concern and that what they fairly convey in their context is what the text means"); Neil Gorsuch, *A Republic, If You Can Keep It* 132 (2019) ("The text of the statute and only the text becomes law. Not a legislator's unexpressed intentions, not nuggets buried in the legislative history, and certainly not a judge's personal policy preferences."); Brett M. Kavanaugh, Book Review, *Fixing Statutory Interpretation Judging Statutes*, 129 Harv. L. Rev. 2118, 2118 (2016) ("The text of the law is the law."); Elena Kagan, The Scalia Lecture: A Dialogue with Justice Kagan on the Reading of Statutes, at 8:28 (Nov. 17, 2015), http://today.law.harvard.edu/in-scalia-lecture-kagan-discusses-statutory-interpretation ("We're all textualists now."). Indeed, the conclusion that the words of R.C.M. 104(a)(1) necessarily differ in meaning from the different words employed in Article 37, UCMJ, is wholly in line with the norm that courts adhere to the plain meaning of any text—statutory, regulatory, or otherwise. *See, e.g.*, *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020) (explaining that courts "may not narrow a provision's reach by inserting words Congress chose

---

[5] R.C.M. 104(a), a regulation, *see* Article 36, UCMJ, 10 U.S.C. § 836 (2012), is thus more protective than the statute—Article 37, UCMJ—as it proscribes a broader swath of conduct. This is entirely permissible. *See, e.g.*, *United States v. Adcock*, 65 M.J. 18, 24 (C.A.A.F. 2007) (explaining that the President has the "authority to prescribe rules and regulations implementing the UCMJ, including provision of 'additional or greater rights' than those provided for by Congress" (citations omitted)).

[6] *Cf. United States v. Bergdahl*, __ M.J. __, __ (8) (C.A.A.F. 2020) (Maggs, J., concurring in part and concurring in the judgment).

to omit"); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("If uncertainty does not exist, . . . [t]he regulation then just means what it means—and the court must give it effect, as the court would any law."); *Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017) (stating that it is a "basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written").

Consequently, the clear language of R.C.M. 104(a)(1) provides that any sitting president, to include President Trump, has the ability to commit unlawful command influence.

Although we hold that Senator McCain and President Trump *could* commit unlawful command influence, it does not necessarily follow that they *did* so. We must still determine whether their conduct resulted in the appearance of unlawful command influence based on the facts of this particular case.

## B. "Some Evidence" of Unlawful Command Influence

We hold that Appellant has satisfied his low burden of presenting "some evidence" of unlawful command influence in this case. *Boyce*, 76 M.J. at 249 (internal quotation marks omitted) (citation omitted).

### 1. Senator McCain

In October 2015 while Appellant's case was pending a referral decision, Senator McCain told a reporter: "If it comes out that [Appellant] has no punishment, we're going to have to have a hearing in the Senate Armed Services Committee." Senator McCain was not just a member of the Senate who was subject to the UCMJ, he was the chairman of the Senate Armed Services Committee. This leadership position gave him unique sway over the military. For example, he could delay or block assignments or promotions of senior military personnel. *See* Standing Rules of the Senate, S. Doc. No. 113-18, Rule XXV, at 20 (2013). Further, Senator McCain did not make this public comment in the context of conducting congressional oversight of the armed forces regarding military justice issues generally, or the disposition of certain categories of cases, or even the disposition of a particular case that was already final. Rather, Senator McCain made his public threat to hold a hearing in a specific case *that was currently pending* if the sentence imposed in that specific case was not

to his liking. This situation is altogether different from standard congressional oversight, and the quid pro quo nature of Senator McCain's threat entitles Appellant to cite to it as "some evidence" that could cause an "objective, disinterested observer . . . [to] harbor a significant doubt about the fairness" of Appellant's court-martial. *Boyce*, 76 M.J. at 248–49 (internal quotation marks omitted) (citations omitted).

Senator McCain's comment was especially problematic because of the timing of his remarks. He made them after learning that the preliminary hearing officer in Appellant's case recommended that the charges be referred to a special court-martial not empowered to adjudge a bad-conduct discharge, and before the general court-martial convening authority (GCMCA) made a referral decision. Thus, Senator McCain's public threat to hold a hearing provides "some evidence" of an appearance of unlawful command influence because it had the potential to appear to "coerce or . . . influence" the outcome of Appellant's court-martial under Article 37, UCMJ.[7] *Boyce*, 76 M.J. at 249, 253 (internal quotation marks omitted).

## 2. President Trump

Appellant also has presented "some evidence" of unlawful command influence with respect to President Trump. Several of the public comments made about Appellant by Mr. Trump at campaign rallies while he was a candidate for president

---

[7] As noted by our colleague, the military judge concluded that " '[t]he defense has simply failed to provide some evidence which, if true, would constitute [unlawful command influence] which would have a logical connection to this court-martial in terms of potential to cause unfairness in the proceedings.' " *Bergdahl*, __ M.J. at __ (6) (Maggs, J., concurring in part and concurring in the judgment) (second alteration in original) (italics removed). However, this is a conclusion of law, not a finding of fact, and is reviewed de novo by this Court. *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994) ("Where the issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that this Court reviews *de novo*."). Moreover, we underscore the point that Appellant has solely raised before this Court the issue of *apparent* unlawful command influence, and a de novo review of the facts as applied to the *apparent* unlawful command influence demonstrates that Appellant has met his initial low burden of presenting "*some* evidence."

were both inaccurate and inflammatory. For example, Mr. Trump made comments such as the following:

> Take Sergeant Bergdahl, does anybody remember him? (Crowd boos). So, so this is the way we think. So we get a traitor named Bergdahl, a dirty, rotten traitor (crowd applauses [sic]), who by the way when he deserted, six young, beautiful people were killed trying to find him, right? And you don't even hear about him anymore! Somebody said the other day, "Well he had some psychological problems." You know, you know in the old days (mimics shooting a rifle), bing, bong! (Crowd cheers). When we were strong, when we were strong. So we get Bergdahl, a traitor, and they [the Taliban] get five of the people that they most wanted anywhere in the world, five killers that are right now back on the battlefield doing a job. That's the kind of deals we make! That's the kind of deals we make, right? Am I right?

Def. Appellate Ex. No. 56, Compendium of Trump Campaign Comments about Sergeant Bergdahl, at 30–31 [hereinafter Def. Appellate Ex.], and:

> We get a dirty, rotten, no-good traitor named Bergdahl. Sergeant Bergdahl. And they [the Taliban] get, they get, five of the greatest people that they know. The biggest killers and believe me they're back out there and [President Obama] says[,] "Oh they're not back in the battle," but believe me folks, they're back on the battlefield and they want to kill everybody here and they want to kill everybody there. So we get this dirty, rotten, no-good traitor who 20 years ago would've been shot, who 40 years ago they would've done it within the first hour, and who now might not, maybe nothing's going to happen. Don't forget, with Bergdahl we lost at least five people and I watched the parents on television, I've seen the parents, I've met one of the parents, who're devastated, ruined, destroyed. And they were killed going out to try and bring him back, and they lost five people, probably six, by the way. But at least five people. . . . And everybody in the platoon, everybody was saying he walked off, he's a traitor. They said he's a whack job but we made this deal knowing. Now I would've said[,] "Oh really? He's a traitor? Pass! Let 'em [the Taliban] have him, he's done." Frankly, frankly, I would take that son of a bitch, I'd fly him back, I'd drop him right over the top, I'm telling you. I'm telling you.

Def. Appellate Ex., at 45.

To begin with, "[t]he term 'traitor' is particularly odious, particularly in the military community." *United States v. Barrazamartinez*, 58 M.J. 173, 176 (C.A.A.F. 2003). And importantly, the record does not support the contention that Appellant was a traitor. Appellant was neither charged with nor convicted of either the federal crime of treason, 18 U.S.C. § 2381 (2012) ("Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason . . . ."), or the military offense of aiding the enemy, a violation of Article 104, UCMJ, 10 U.S.C. § 904 (2012) (criminalizing aiding or attempting to aid the enemy, or knowingly harboring the enemy, giving intelligence to the enemy, or communicating with the enemy). Indeed, there is simply no evidence that Appellant sought to defect to or to otherwise aid the Taliban. Rather, throughout his captivity Appellant complied with the Code of Conduct for Members of the Armed Forces of the United States[8] by attempting to escape at least a dozen times. On one occasion he broke free for eight days before the Taliban recaptured him. When asked how he stayed motivated to live despite the escalating torture and abuse, Appellant testified: "Trying to find a way to escape, . . . trying to learn as much intel as I could so that I could get that back out if I made it out . . . . And not letting them [the Taliban]—not letting them win."

Likewise, the record does not support the assertion that six (or even five) people were killed trying to find Appellant. However, as explained in detail below, a number of military members were injured—some seriously—while searching for Appellant.

In other comments he made on the campaign trail, Mr. Trump opined—prior to Appellant's court-martial conviction—that Appellant was indeed a deserter.[9] Such a

---

[8] "If I am captured . . . I will make every effort to escape." Exec. Order No. 10,631, 3 C.F.R. 266 (1954–1958).

[9] For example: "But we fought to get a traitor, who, when our country was strong, would've been executed for desertion" Def. Appellate Ex., at 28; "[H]e was a deserter 100% it's not like the old

proclamation is antithetical to the presumption of innocence the Constitution affords all accused. *See Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.").

And yet, we underscore the fact that as a presidential *candidate*, Mr. Trump was neither a person "subject to the [C]ode" as a retiree or otherwise, nor a convening authority. *See* Articles 2, 22, UCMJ. Consequently, by their terms, neither Article 37, UCMJ, nor R.C.M. 104(a)(1), applied to comments that Mr. Trump made as a presidential candidate, no matter how inaccurate or unfair those statements were.

However, by the time Appellant pleaded guilty at his court-martial, Mr. Trump had become President of the United States. On the same day that Appellant entered his guilty pleas, President Trump made the following remarks during a press conference in the Rose Garden:

> Well, I can't comment on Bowe Bergdahl because he's—as you know, they're—I guess he's doing something today, as we know. And he's also—they're setting up sentencing, so I'm not going to comment on him. But I think people have heard my comments in the past.

President's News Conference With Senate Majority Leader A. Mitchell McConnell, *2017 Daily Comp. Pres. Doc.* 12 (Oct. 16, 2017). The last sentence of this statement was a ratification of, and served to incorporate by reference, the comments Mr. Trump had previously made on the campaign trail regarding Appellant's case, which are referenced above. *See supra* pp. 10–12 & n.9. As the military judge succinctly noted:

> While somewhat ambiguous, the plain meaning of the President's words to any reasonable hearer could

---

days, in the old days you deserted you were in big trouble. Today they want to find all sorts of excuses—I don't know what, it's crazy, it's just crazy[,]what's going on with our country is absolutely insane" Def. Appellate Ex., at 368; "I always say, we get Bergdahl, a horrible traitor who deserted! In the old days you get shot! (Mimics a handgun firing with his hand)." Def. Appellate Ex., at 375.

be that in spite of knowing that he should not com-
ment on the pending sentencing in this case[,] he
wanted to make sure that everyone remembered
what he really thinks should happen to the accused.

And while he was a candidate, Mr. Trump made "what he
really thinks" very clear: Appellant was a deserter and a trai-
tor who should be severely punished. *See generally supra* pp.
10–12. This public reference to, and ratification of, these
views after Mr. Trump became President had the potential to
appear to "censure, reprimand, or admonish a court-mar-
tial . . . or any member, military judge, or counsel thereof,
with respect . . . to any other exercise of the functions of the
court-martial . . . or such persons in the conduct of the pro-
ceedings." R.C.M. 104(a)(1).

Similarly, President Trump later posted to the social net-
working website Twitter a comment in which he referred to
the military judge's sentencing decision in Appellant's case as
"a complete and total disgrace to our Country and to our Mil-
itary." Donald J. Trump (@realDonaldTrump), *Twitter* (Nov.
3, 2017, 11:54 AM). This statement appeared both to "cen-
sure" the court-martial with respect to the sentence, and had
the potential to appear to influence other subsequent "func-
tions of the court-martial," such as the convening authority's
review and action, along with the later appellate phases of
this case. R.C.M. 104(a)(1).

### C. No Intolerable Strain on the Military Justice System

As noted above, a sitting president of the United States
can commit both apparent and actual unlawful command in-
fluence. The same held true for the late Senator McCain.
Therefore, statements by such persons about a pending case
are perilous. Because of their capacity to influence decision
makers in a court-martial, comments about a pending crimi-
nal matter pose a grave risk to the goal of ensuring that jus-
tice is done in every case. Specifically, improper statements
could cause an innocent accused to suffer adverse criminal
consequences such as a wrongful conviction or an increased
sentence, or could cause a guilty accused to walk free—de-
spite the commission of heinous crimes—if the actual or ap-
parent unlawful command influence results in the dismissal

of charges. *See, e.g.*, *Barry*, 78 M.J. at 80 (dismissing sexual assault charge with prejudice for actual unlawful command influence); *United States v. Riesbeck*, 77 M.J. 154, 167 (C.A.A.F. 2018) (dismissing charges of making a false official statement, rape by force, and communicating indecent language with prejudice for actual unlawful command influence); *Boyce*, 76 M.J. at 253 (dismissing charges of rape and assault consummated by a battery without prejudice for apparent unlawful command influence).

In this particular case, however, we conclude that a finding of apparent unlawful command influence is not warranted because there was no intolerable strain on the military justice system. This conclusion is predicated on all of the relevant facts of this case, regardless of whether the various stages of the court-martial proceedings are viewed individually or cumulatively.

To begin with, compelling evidence was presented at a hearing held pursuant to Article 32, UCMJ, 10 U.S.C. § 832 (2012), that Appellant deserted his unit with intent to shirk hazardous duty and that he engaged in misbehavior before the enemy. Make no mistake—these offenses are very serious. In fact, the *Manual for Courts-Martial, United States* (*MCM*) categorizes misbehavior before the enemy as an offense that can be punishable by death, and categorizes desertion as an offense punishable by death, or by any punishment other than death, depending on whether it was committed during a time of war. *See* Articles 85(c), 99(9), UCMJ; *MCM* pt. IV, para. 23.e. (2012 ed.). In light of both the severity of these offenses and the strength of the Government's evidence, an objective, disinterested observer clearly would have expected the Army to court-martial Appellant for this conduct regardless of any public comments by President Trump or Senator McCain.[10]

---

[10] In his brief, Appellant refers to a "longstanding practice of not prosecuting returning [prisoners of war] except for offenses committed in captivity." Brief for Appellant at 21, *United States v. Bergdahl*, No. 19-0406 (C.A.A.F. Dec. 4, 2019). However, the publication cited by Appellant in support of this proposition is less than clear about the parameters of this so-called "practice." *See* Vernon E. Davis, *The Long Road Home: U.S. Prisoner of War Policy and Planning in Southeast Asia* 154–56 (Office of the Secretary of

Indeed, every official involved in this case—including the Army Regulation 15-6 investigating officer[11] and the Article 32, UCMJ, preliminary hearing officer—recommended that Appellant's case be sent to some type of court-martial. Thus, there was no appearance of unlawful command influence during the investigation and preferral stages of this case.

In regard to the next stage of the court-martial proceeding, Appellant emphatically—and understandably—underscores the fact that although the Article 32, UCMJ, preliminary hearing officer recommended that this case be referred to a special court-martial not empowered to adjudge a bad-conduct discharge—which would have precluded the dishonorable discharge that was actually imposed here—the GCMCA in this case, General (GEN) Robert B. Abrams, ultimately referred Appellant's case to a general court-martial that was empowered not only to adjudge a dishonorable discharge but also to impose a far longer term of imprisonment. We acknowledge that this aspect of the case is a close question and it has given us great pause. At first blush it raises the question of whether an objective, disinterested observer would harbor a significant doubt about the fairness of the GCMCA's referral decision and whether it was affected by

---

Defense, 2000). Further, this "practice" pertained to individuals who served in the Vietnam War, not to military personnel who served in more recent armed conflicts. *Id*. And importantly, Appellant cites no specific instance of this "practice" having been invoked when a soldier's intentional and criminal act of desertion resulted in his fellow servicemembers being wounded while trying to rescue the deserter from the enemy. Therefore, we conclude that an objective, disinterested observer would give little weight to Appellant's argument.

[11] *See generally* Dep't of the Army, Reg. 15-6, Boards, Commissions, and Committees, Procedures for Administrative Investigations and Boards of Officers (Apr. 1, 2016). Major General (MG) Dahl, who served as the Army Regulation 15-6 investigating officer, found that the elements for a criminal offense were met and recommended forwarding the investigation "for whatever action, if any, the GCMCA deems appropriate." MG Dahl's recommendation was followed. At trial, MG Dahl recommended that no term of imprisonment be imposed on Appellant. Once again, MG Dahl's recommendation was followed.

Senator McCain's public comment. Nevertheless, after long consideration, we answer this question in the negative.

To start, GEN Abrams stated unequivocally in a sworn affidavit that his decisions in this case were "not impacted by any outside influence." Further, GEN Abrams characterized the statements made by Senator McCain as "inappropriate" and he testified that he "absolutely [did] not" consider them in making his referral decision, demonstrating a denunciation of and disassociation from these comments. Although these two points are not dispositive of the issue in a case involving the appearance of unlawful command influence, *see Boyce*, 76 M.J. at 251 (holding that the military judge erred by relying on the GCMCA's personal assurances that he was not improperly influenced), they are factors that an objective, disinterested observer would appropriately consider in conjunction with the additional supporting facts discussed below.

Next, there is no requirement that a convening authority adopt the recommendations of an Article 32, UCMJ, preliminary hearing officer. *See* R.C.M. 601. Indeed, any observer of the military justice system would realize that it is not uncommon for a GCMCA to refer a case to a court-martial in a manner contrary to the recommendation of the Article 32, UCMJ, preliminary hearing officer, even in those instances where there is not a scintilla of unlawful command influence. But beyond this general point, there also are specific facts in the record that would allay the concerns of an objective, disinterested observer in this particular case.

For example, in properly analyzing this issue, it is vitally important to bear in mind that the Article 32, UCMJ, preliminary hearing officer who recommended a special court-martial in this case noted in his report that he did not have information regarding casualties. He also explained that the "strongest factor" in causing him to make a recommendation for a special court-martial was the fact that the Government failed to submit before him any evidence "demonstrating that anyone was killed or wounded" during the military's search and recovery efforts related to Appellant's disappearance. Moreover, he specifically opined in his preliminary hearing report that "the issue of casualties should be conclusively addressed prior to a final decision on the disposition o[f] SGT Bergdahl's case." And, as detailed immediately below, it later

was shown by the Government at sentencing that several American servicemembers were indeed injured, some severely, while on missions primarily designed to locate Appellant.

When Appellant's platoon discovered that he was missing in June 2009, they immediately began searching for him and promptly updated his duty status to DUSTWUN (Duty Status Whereabouts Unknown).[12] *United States v. Bergdahl*, 79 M.J. 512, 518 (A. Ct. Crim. App. 2019). Consequently, thousands of United States soldiers, sailors, airmen, and Marines conducted an intensive search of the region spanning thirty to forty-five days and delaying and deferring many other military operations in an attempt to locate Appellant. *Id.* One witness testified, "Everybody in Afghanistan was looking for Bergdahl." The increased presence of American troops precipitated increased interactions with the enemy, which ultimately increased the level of risk to those searching for Appellant.

Throughout the DUSTWUN search, there were numerous American casualties, at least three of which required extensive medical treatment. During a July 8, 2009, rescue mission to retrieve Appellant, Retired Navy SEAL Senior Chief Petty Officer James Hatch was shot in the leg, requiring eighteen surgeries over several years to treat his injuries. Remco, a military dog, was also killed during the mission. On a different rescue mission during the same time frame, at least two Army specialists came under rocket-propelled grenade fire. As a result, former Specialist Jonathan Morita sustained serious injuries to his right hand, continues to experience physical pain, and has not fully regained the use of his hand despite surgery. Additionally, during the same mission, Master

---

[12] DUSTWUN is used "when the responsible commander suspects the member [of the armed forces] may be a casualty whose absence is involuntary, but does not feel sufficient evidence currently exists to make a definite determination of missing or deceased." United States Army Human Resources Command, *Army Casualty and Mortuary Affairs Frequently Asked Questions* (Mar. 23, 2020), https://www.hrc.army.mil/content/Army%20Casualty%20and%20Mortuary%20Affairs%20Frequently%20Asked%20Questions (last visited Aug. 19, 2020).

Sergeant (MSG) Mark Allen was shot through the head. Following his injury, MSG Allen was in a "vegetative state," severely disabled, unaware of his surroundings, unable to speak, and rarely able to recognize those around him. Despite undergoing fifteen to twenty surgeries which included the removal of both his frontal lobes, MSG Allen continued to experience ninety to one-hundred percent paralysis, suffered from seizures, and required around-the-clock medical care.[13]

This is precisely the type of casualty information that the Article 32, UCMJ, preliminary hearing officer said must be ascertained before a final disposition was made in Appellant's case.[14] And although the preliminary hearing officer was not aware of these casualties, GEN Abrams served in military positions where he would be privy to such information. After Appellant's desertion but before his rescue, GEN Abrams became the Commanding General of the Third Infantry Division. He deployed to Afghanistan in that capacity where he received briefings concerning the Army's efforts to rescue Appellant. Later, GEN Abrams served as the Senior Military Assistant to the Secretary of Defense, during which time he was present for briefings regarding Appellant, was aware of negotiations taking place to effect Appellant's return from Taliban captivity, and provided daily reports to the Secretary of Defense concerning Appellant's health and welfare following his eventual return to the United States. And when GEN Abrams served as the convening authority in Appellant's case, he held the position of Commanding General of the United States Army Forces Command (FORSCOM), one of the highest command posts in the military. Thus, an objective and disinterested observer pondering the fairness of the disposition of this case would recognize that GEN Abrams had ready access to

---

[13] MSG Allen died in October 2019. Jamiel Lynch & Ralph Ellis, *Mark Allen, Soldier Injured in 2009 Search for Bowe Bergdahl, Dies*, CNN (Oct. 14, 2019), https://www.cnn.com/2019/10/14/us/mark-allen-dies-soldier-who-searched-for-bowe-bergdahl/index.html.

[14] The preliminary hearing officer also said that any such evidence of casualties needed to be served on the defense. And yet, there is no evidence that the Government did so. However, Appellant has not raised this issue before this Court.

this casualty information at the time he decided to send Appellant's case to a general court-martial rather than to the more limited special court-martial recommended by the Article 32, UCMJ, preliminary hearing officer.[15]

Any lingering doubts an objective, disinterested observer might have about the reasons behind GEN Abrams's decision to refer Appellant's case to a general court-martial would be allayed by the following essential point. As noted above, at the time of his referral decision, as well as at the time of his clemency decision, GEN Abrams was the commander of FORSCOM. In that position, his mission was to protect and enhance the war fighting capabilities of our armed forces. *See, e.g.*, *Military Construction Appropriations for 1974: Hearings Before the Subcomm. of the H.R. Comm. on Appropriations*, 93d Cong. 208 (1973) ("The FORSCOM commander will be responsible for combat readiness of all . . . Army . . . forces . . . ."). An indispensable element of unit cohesion, readiness, and good order and discipline is the morale of the troops. *See, e.g.*, *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("[T]o accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps."). Here, an objective, disinterested observer "fully informed of all the facts and circumstances," *Boyce*, 76 M.J. at 249─50 (internal quotation marks omitted) (quoting *Salyer*,

---

[15] Even if GEN Abrams had no specific knowledge of any casualties at the time he referred the charges to a general court-martial, he *was* aware of the following: (1) United States Armed Forces conducted a massive, long-term manhunt for Appellant in hostile territory in Afghanistan; (2) during a search of that scale and in that location, it was likely that at least some casualties occurred; (3) the Article 32, UCMJ, preliminary hearing officer specifically noted in his report that evidence about casualties should be developed prior to making "a final decision on the disposition o[f] SGT Bergdahl's case"; (4) a referral of charges to a general court-martial instead of a special court-martial merely increases the potential *maximum* punishment that can be imposed on an accused and is not a mandate of a *minimum* punishment; and (5) evidence about casualties could be presented at trial or sentencing, so by referring Appellant's case to a general court-martial, GEN Abrams merely would be empowering the court-martial panel or the military judge to make an appropriate final disposition at that later juncture of the case. Thus, GEN Abrams's referral decision is consistent with the Article 32, UCMJ, preliminary hearing officer's recommendation.

72 M.J. at 423), would recognize that if GEN Abrams had chosen to refer Appellant's case to a special court-martial that was not even empowered to adjudge a bad-conduct discharge, his decision would have been devastating to military morale. After all, members of the armed forces would have realized that GEN Abrams made that referral decision despite the fact that he knew there was overwhelming evidence that Appellant had deserted his post in a combat zone with intent to shirk hazardous duty and had engaged in misbehavior before the enemy, and despite the fact that he knew that other servicemembers were injured or were likely injured in the course of the military's efforts to rescue Appellant from the consequences of his own misconduct. Therefore, a hypothetical observer would "[*not*] harbor a significant doubt about the fairness of [Appellant's] proceeding[s]," *id*. (first alteration in original) (internal quotation marks omitted) (quoting *Salyer*, 72 M.J. at 423), because he or she would understand that GEN Abrams's referral decision was squarely rooted in the proper execution of his duties as FORSCOM commander and was not the product of public comments by Senator McCain.

In terms of the next stage of Appellant's court-martial proceedings, it cannot be emphasized strongly enough that Appellant *chose to plead guilty* to the offenses of desertion with intent to shirk hazardous duty and misbehavior before the enemy.[16] In doing so, he explicitly agreed in open court that he was voluntarily pleading guilty *because he was in fact guilty* and not for any other reason. In a lengthy plea colloquy, Appellant explained in detail his intent to walk off his post in hostile territory, his reasoning for doing so, and the exact steps he took to attain his objective. Additionally, Appellant testified that the charged offenses "accurately and correctly

---

[16] Specifically, pursuant to his guilty pleas, a military judge sitting as a general court-martial convicted Appellant of one specification of desertion with intent to shirk hazardous duty and one specification of misbehavior before the enemy in violation of Articles 85 and 99, UCMJ. Appellant pleaded guilty to misbehavior before the enemy as the charge was written. However, instead of pleading guilty to the entire charged period of desertion from June 30, 2009, until May 31, 2014, Appellant pleaded guilty to just one day of desertion—June 30, 2009—because he was captured the same day he left his observation post. The military judge accepted Appellant's guilty plea by exceptions and substitutions.

describe what [he] did." Based on Appellant's own words, no impartial observer would conclude that it was the comments made by the President of the United States and/or by the chairman of the Senate Armed Services Committee that caused Appellant to plead guilty; rather, it was the strength of the Government's evidence that caused him to take that step. Moreover, after Appellant raised to the military judge the issue of apparent unlawful command influence, the military judge offered Appellant the opportunity to *withdraw his plea of guilty*, and Appellant declined to do so. Thus, no claim of unfairness regarding the guilty plea phase of the court-martial proceedings can prevail.

In terms of the sentencing stage of these proceedings, Appellant presented significant mitigation evidence. For example, he produced evidence that prior to his Army service, he served in the United States Coast Guard but soon was separated, at least in part because of his mental health. Indeed, Appellant's Coast Guard physician noted that Appellant should not be allowed to reenlist in the military unless Appellant was first medically cleared by a psychiatrist. Although the Army complied with all applicable regulations regarding the enlistment of Appellant, the Army was not aware of this Coast Guard proviso when it allowed Appellant to join its ranks. Consequently, as a medical expert in this case testified, at the time of the offenses in 2009 Appellant likely suffered from several severe preexisting psychiatric conditions, to include schizotypal personality disorder.

To be clear, the sanity board in this case concluded that although Appellant was suffering from a severe mental disease or defect, he nevertheless was able to "appreciate the nature and quality and wrongfulness of his conduct." Therefore, an insanity defense did not apply here. However, the record reflects that Appellant's mental health conditions contributed to his misconduct in Afghanistan and explained in part his exceptionally poor judgment in deserting his post in a combat zone. Notably, the preliminary hearing officer who handled this case pursuant to Article 32, UCMJ, stated in his report that there "is almost unanimous agreement that SGT Bergdahl left [his post] with good, albeit misguided, motives."

Additionally, although it was a tragic consequence of his own decision to abandon his post, Appellant presented compelling evidence which detailed the five years he suffered from brutal and persistent physical and psychological torture at the hands of the Taliban. During the first year of his captivity, the Taliban regularly whipped Appellant with copper cables, heavy rubber hoses, and the buttstocks of their AK-47 assault rifles; burned the bottom of Appellant's feet with matches; and forced Appellant to watch execution videos while threatening to decapitate him. For several months, Appellant's hands and feet were shackled to a metal bedframe, causing the development of bedsores and resulting in such severe atrophy of Appellant's muscles that he could not walk. Eventually, Appellant's captors detained him inside an iron cage where he was shackled for the remaining four years he spent as their prisoner. The cage was approximately six feet wide and seven feet long, was made of quarter-inch iron bars spaced approximately four inches apart on all sides—including on the bottom—and was elevated about eight inches above the ground. The size and construction of the cage made it "excruciatingly painful" to stand, and "impossible" to move around. Appellant was left to "rot inside that cage." This torture exacerbated Appellant's preexisting mental conditions. As a result, he requires "more complicated" and "more extended" medical treatment for his mental health problems. However, Appellant is precluded from accessing such healthcare benefits provided by the United States Department of Veterans Affairs. *See* 38 U.S.C. § 5303(a) (2012).

And finally, at sentencing Appellant introduced evidence that, upon his return to military custody, he provided significant intelligence to the Army. One witness at trial described the information supplied by Appellant as a "goldmine" that "reshaped" the Army's understanding of hostage-taking in the region, potentially helping other prisoners of war in Afghanistan. This information was later incorporated into Army training programs.

Ultimately, however, this mitigation evidence does not overcome our firm conviction that the sentence adjudged in this case had nothing to do with the comments made by Senator McCain or President Trump and was instead based solely on the serious offenses to which Appellant pleaded guilty and

on the facts established during the Government's case in aggravation. Indeed, it is telling that at his sentencing hearing after his guilty plea, and *fully aware of his own case in mitigation, Appellant specifically recognized that he was deserving of punishment and asked to have a dishonorable discharge imposed upon him*. His counsel stated the following:

> Sergeant Bergdahl has been punished enough. Even the most glorious of confinement facilities would serve no rehabilitative purpose or any principle under our *Manual for Courts-Martial . . .* based on what Sergeant Bergdahl has suffered at the hands of his Taliban captors for five years and the long-standing physical effects that he would have from that.
> *But punishment is warranted for his actions, and the defense would request that you give Sergeant Bergdahl a dishonorable discharge . . . .*

(Emphasis added.)

Then, during a lengthy exchange between Appellant and the military judge, Appellant acknowledged both that he was fully aware of the implications of receiving a dishonorable discharge and that he wanted the military judge to impose that specific punishment upon him. Accordingly, it is difficult indeed to discern how an impartial observer would conclude that this aspect of Appellant's sentence was unfair.

Moreover, we underscore the fact that despite the sensational nature of this case, despite the public calls for the lengthy imprisonment of Appellant, despite Senator McCain's threat that he would hold a hearing if Appellant did not receive a sentence to his liking, and despite the Commander in Chief's ratification of his statements that Appellant was a traitor who should be severely punished, the military judge imposed on Appellant *no prison time whatsoever*. Thus, an objective, disinterested observer would conclude that rather than being swayed by outside forces, the military judge was notably impervious to them. Indeed, it can be said that this result—whether one agrees with it or not—stands as a testament to the strength and independence of the military justice system. Therefore, assertions of an appearance of unlawful command influence are once again unavailing.

And finally, in terms of the clemency and appellate stages of this case, we reiterate the following critical points: Appellant pleaded guilty to deserting his unit with intent to shirk hazardous duty and of engaging in misbehavior before the enemy; American servicemembers were injured searching for Appellant after he chose to desert his post in a combat zone; the United States government was required to exchange five members of the Taliban who had been held at the U.S. detention facility in Guantanamo Bay, Cuba, in order to secure Appellant's release; and yet the military judge imposed as a sentence only a dishonorable discharge, a reduction in rank, and partial forfeitures of pay after Appellant specifically asked to receive a dishonorable discharge. Under these circumstances, we are confident that an objective, disinterested observer would decide that the convening authority's decision not to exercise his discretionary clemency authority on behalf of Appellant was a foregone conclusion unaffected by any public comments made about the case. We further observe that Appellant's post-trial matters submitted to the convening authority were "absent of any formal request for clemency in the form of a sentence reduction." *Bergdahl*, 79 M.J. at 526. Similarly, we conclude that in light of these facts, there would be no basis for an impartial observer to believe that the decision by the Army Court of Criminal Appeals to affirm the findings and sentence in this case was in any way unfair.

### III. Conclusion

The totality of these circumstances makes it clear beyond a reasonable doubt that the comments made by President Trump and Senator McCain—regardless of how "troubling,"[17]

---

[17] *Bergdahl*, 79 M.J. at 519 (internal quotation marks omitted).

"disturbing,"[18] "disappointing,"[19] "inaccurate,"[20] "inappropriate,"[21] and "ill-advised"[22] they were—did not place an intolerable strain upon the public's perception of the military justice system in this particular case. Rather, the record reflects that the decision-making at each stage of Appellant's court-martial proceedings was unaffected by any outside influences. Therefore, we are confident that "an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of these proceedings." *Boyce*, 76 M.J. at 249 (internal quotation marks omitted) (quoting *Lewis*, 63 M.J. at 415). Accordingly, we affirm the decision of the United States Army Court of Criminal Appeals.

---

[18] *Id.* (internal quotation marks omitted).

[19] *Id.* (internal quotation marks omitted).

[20] *Id.* at 527 (internal quotation marks omitted).

[21] R. of Trial, *United States v. Bergdahl*, vol. XXXVI, 579 (testimony of GEN Robert Abrams).

[22] *Bergdahl*, 79 M.J. at 522 (internal quotation marks omitted).

Chief Judge STUCKY, concurring in part and dissenting in part.

This case has caused me as much concern as any in the more than thirteen years I have sat on this Court. It was superbly argued and has brought forth the finest efforts of my colleagues, both in the majority opinion and in the concurrences. I join Judge Sparks's opinion but find it necessary to write separately to express my dismay that senior members of our government thought it appropriate to try to influence the outcome of Appellant's court-martial.

In the past, I have questioned the doctrine of apparent unlawful command influence, but the Court has adhered to it. *See United States v. Boyce*, 76 M.J. 242, 254 (C.A.A.F. 2017) (Stucky, J., dissenting). Moreover, if there ever were a case in which it should be applicable it is this one.

Senator McCain certainly had a right to announce that he intended to hold hearings on Appellant, as Judge Maggs correctly points out. But conditioning the hearings on Appellant's receiving a sentence to no punishment was undoubtedly meant to cause the sentencing authority and the convening authority to carefully consider the adverse personal and institutional consequences of adjudging or approving such a sentence.

President Trump's vicious and demeaning remarks about the treatment he believed Appellant should receive were relayed to members of the public, some of whom would be called upon to decide Appellant's fate. Given the reckless nature of the comments made and ratified by the President and the glare of publicity that surrounds the utterances of any president, and particularly this one, the government has a unique burden to bear in rebutting the appearance of unlawful influence. It has not done so. That being the case, I agree with Judge Sparks: the comments of Senator McCain and the President have placed an intolerable strain on the military justice system, and the only appropriate remedy is dismissal of the charges and specifications with prejudice.

One final thing needs to be said. This case is unique in modern American military jurisprudence. Let us hope that we shall not see its like again.

Judge SPARKS, concurring in part and dissenting in part, with whom Chief Judge STUCKY joins.

This case is a cautionary example of the vulnerabilities of the military justice system and lends fodder to those who continue to question whether the military has a credible criminal justice system. I am concurring in part and dissenting in part from the majority opinion.[1] I agree with the majority that (1) both the late Senator McCain and the President could commit unlawful influence under the Uniform Code of Military Justice (UCMJ) and the *Manual for Courts-Martial, United States* (*MCM*), and (2) that there is some evidence that each committed such influence. However, I part with the majority's ultimate conclusion that the Government carried its burden to establish beyond a reasonable doubt that an objective, disinterested observer, fully informed of all the facts and circumstances, would *not* harbor a significant doubt about the fairness of the proceedings. Additionally, in my view, the egregious circumstances of this particular case deprived Appellant of due process under the Fifth Amendment of the United States Constitution. U.S. Const. amend. V.

I. *The Commander in Chief*

As Commander in Chief, the President has significant authority and control over the military and the military justice system. With regard to the latter, under Article 36, UCMJ, 10 U.S.C. § 836, Congress has delegated authority to the President to create procedural rules for the administration of justice via the *MCM*. Under that authority, as the majority has held, the President is a convening authority. Furthermore, although not commanders in the strict military sense, the President, the Secretary of Defense, and the service secretaries are vested with the mantle of command authority. *See* Article 22, UCMJ, 10 U.S.C. § 822; Amicus Brief in Support of Appellant's Petition for Grant of Review at 6, *United States v. Bergdahl*, No. 19-0406 (C.A.A.F. Aug. 12, 2019). Thus, when the President or any of these authorities inject

---

[1] I join Parts I, II.A., and II.B. of the opinion of the Court, but respectfully dissent from Parts II.C. and III.

themselves into the military justice system in a manner intending or appearing to compromise a military accused's right to a fair trial, a significant potential unlawful influence problem arises. Further, as admirably and thoroughly detailed by Professors Joshua E. Kastenberg and Rachel E. VanLandingham in their amicus brief to this Court cited above, the President pursuant to his Article II powers retains significant control over the military establishment. *Id*. In essence, the Chief Executive of the country enjoys a position atop the military justice system that allows his voice to be heard far and wide.

## II. *The Appearance of Unlawful Influence*

As noted earlier, the majority and I disagree on application of the standard used to determine an appearance of unlawful influence in this case. Specifically, I disagree that the Government carried its burden to establish that the cumulative effect of Senator McCain's comment; his staff's persistent focus on this particular case; the constant invective directed at this accused by the Commander in Chief as a candidate and later ratified once elected to office; and the Commander in Chief's comments while in office, did not put an intolerable strain on public perception of the military justice system. Unlike the majority, I cannot conclude that "an objective, disinterested observer, fully informed of all the facts and circumstances" would not "harbor a significant doubt about the fairness of the proceeding." *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (internal quotation marks omitted) (citation omitted).

I believe this fictional member of the public must have some basic understanding of the importance of the concept of unlawful influence and its potentially corrosive effect on the military criminal justice system. Because of the unique nature of the military justice system and the even more unique nature of the concept of unlawful command control, a typical member of the public may be unable to comprehend the full breadth and complexity of the issue. In fact, arguably, the only comparable issue in state and federal criminal justice systems is adverse pretrial publicity.

Although, the facts of this case giving rise to the appearance of unlawful influence could also fairly be characterized as adverse pretrial publicity, every military justice practitioner understands the difference between the two concepts. Unlawful influence exerted on the military trial process corrupts and erodes the very legitimacy of the system. It is not simply a question of a damaging adjacent outside influence. The process itself is tainted.

By imputing this understanding to the fictional observer, we are arming him or her with the necessary information to properly assess whether a given set of facts places an intolerable strain on the system. An observer with an appreciation for the unique role of undue influence in the military justice process is, in my mind, more suitably positioned to assess the degree of strain such influence might impart. Under the circumstances of the present case, such an informed observer would believe that—whether or not the results of Appellant's trial were foreordained—the comments of Senator McCain and of the Commander in Chief corrupted the trial process beyond repair.

### III. *Due Process*

The facts of this case also raise a serious due process concern. The concept of constitutional due process is rooted in the notion of fundamental fairness, and this Court has long recognized this concern as it pertains to unlawful command influence. "The exercise of command influence tends to deprive servicemembers of their constitutional rights." *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986). "[I]n the military justice system both the right to a trial that is fair, and the right to a trial that is objectively seen to be fair, have constitutional dimensions sounding in due process." *Boyce*, 76 M.J. at 249 n.8. Congress's "prime motivation for establishing a civilian Court of Military Appeals was to erect a further bulwark against impermissible command influence." *Thomas,* 22 M.J. at 393. So the question arises: What process was due the accused in this case?

During the period in which the UCMJ was being drafted, Congress struggled with striking the appropriate balance

between discipline and justice. One of the most controversial issues was the extent to which officers in the chain of command should be authorized to influence courts-martial. *See United States v. Littrice*, 3 C.M.A. 487, 13 C.M.R. 43 (1953).[2] In *Littrice*, the first judges appointed to this Court made it apparent that they understood the critical responsibility of resolving the delicate balance between command control and true justice:

> Thus, confronted with the necessity of maintaining a delicate balance between justice and discipline, Congress liberalized the military judicial system but also permitted commanding officers to retain many of the powers held by them under prior laws. While it struck a compromise, Congress expressed an intent to free courts-martial members from any improper and undue influence by commanders which might affect an honest and conscientious consideration of the guilt or innocence of an accused.

*Id.* at 491, 13 C.M.R. at 47. In *Littrice*, this Court ultimately determined that undue influence had occurred, concluding that "[t]he accused was convicted and sentenced by a court-martial which was not free from *external influences* tending to disturb the exercise of a deliberate and unbiased judgment." *Id.* at 496, 13 C.M.R. at 52 (emphasis added).

Preserving the inherent fairness of the military justice process by shielding it from outside influence continues as one of this Court's highest responsibilities. Such preservation of an accused's due process protects the impartial and truth-seeking nature of the military, and indeed any, justice system.

---

[2] Over the years that military justice has been under criticism, and particularly during the period the new Uniform Code of Military Justice was being prepared by the Morgan Committee and studied by Congressional Committees, one of the most controversial issues with which all interested parties was concerned dealt with the extent officers in the chain of command should be authorized to influence court-martial activities.

*Littrice*, 3 C.M.A. at 490, 13 C.M.R. at 46.

IV. *Remedy*

Many of our past cases dealt with allegations of the appearance of unlawful influence in which the influence was directed towards various participants in the court-martial system other than the accused. *E.g.*, *United States v. Lewis,* 63 M.J. 405, 406 (C.A.A.F. 2006) (appearance of unlawful influence by the government directed towards the military judge); *United States v. Salyer*, 72 M.J. 415, 417 (C.A.A.F. 2013) (appearance of unlawful influence by the government directed towards the military judge); *Boyce*, 76 M.J. at 244 (appearance of unlawful influence by the Air Force chief of staff directed towards the convening authority). However, in a military trial, the accused is the most important participant since he or she has the most at stake. Moreover, remedies ordered in these past cases have been designed to vindicate a variety of constitutional and regulatory rights afforded a military accused. *E.g.*, *Lewis*, 63 M.J. at 416 (charges and specifications dismissed without prejudice because the error of unlawful command influence cannot be rendered harmless); *Salyer*, 72 M.J. at 428 (findings and sentence dismissed with prejudice because "any remedy short of dismissal at this stage would effectively validate the Government's actions"); *Boyce*, 76 M.J. at 253 (reverse findings and sentence without prejudice, recognizing that "in individual cases that are properly presented to this Court … we will meet our responsibility to serve as a 'bulwark' against [unlawful command influence] by taking all appropriate steps within our power to counteract its malignant effects"). It stands to reason that since this Court has previously been willing to afford the accused a remedy when the unlawful influence was directed towards other participants, we certainly should afford a remedy when the unlawful influence is directed at the accused himself. An accused servicemember has a due process right to be tried in an environment that is free from personal and public vilification by high, even the highest, authorities in the system. The entire trial process must be one that promotes the legitimacy of the military justice system.

V. *Conclusion*

"Command influence is the mortal enemy of military justice." *Thomas*, 22 M.J. at 393. "[T]he apparent existence of 'command control' … is as much to be condemned as its actual existence." *United States v. Johnson*, 14 C.M.A. 548, 551, 34 C.M.R. 328, 331 (1964). "There is no doubt that the appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial." *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991) *overruled on other grounds by United States v. Dinger,* 77 M.J. 447 (C.A.A.F. 2018). For years, we have quoted these principles. We have a responsibility to act and rule in accordance with them. Never in the history of the modern military justice system has there been a case in which the highest level figures, including the Commander in Chief, have sought to publicly demean and defame a specific military accused. The vilification of Sergeant Bergdahl before, during, and after his court-martial was unprecedented, hostile, and pernicious in the extreme. It both placed an intolerable strain on the military justice system and denied the accused his due process right to a fair trial. I am compelled to conclude that the only appropriate remedy in this case is dismissal of the findings and sentence with prejudice. Therefore, I must respectfully dissent from so much of the analysis and judgment that concludes otherwise.

Judge MAGGS, concurring in part and concurring in the judgment.

The lead opinion correctly reasons that Appellant is not entitled to relief under a theory of apparent unlawful command influence unless three conditions are met. The first condition is that the prohibitions in Article 37(a), UCMJ, 10 U.S.C. § 837(a) (2012), or Rule for Courts-Martial (R.C.M.) 104(a)(1), were applicable to the late Senator John McCain and to President Donald Trump when they made certain statements about Appellant and his court-martial. The second condition is that Appellant has produced "some evidence" that one or more of the statements violated the prohibitions of these provisions. *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (internal quotation marks omitted) (citation omitted). The third condition is that the Government has failed to prove beyond a reasonable doubt that the statements "did not place an intolerable strain on the public's perception of the military justice system." *Id.* at 252. The lead opinion determines that the first two conditions are satisfied but that the third condition is not. The lead opinion therefore concludes that Appellant is not entitled to relief.

My views are different, but I reach the same ultimate conclusion. Contrary to the lead opinion, I do not believe that the second condition was met with respect to Senator McCain's statements based on the military judge's findings of fact. In addition, I do not believe that the first condition is met with respect to President Trump because he was not the convening authority in this case and thus did not violate either Article 37(a), UCMJ, or R.C.M. 104(a)(1). I therefore do not join Parts II.A. or II.B. of the lead opinion. As I explain below, I otherwise concur in the lead opinion and I concur in the judgment affirming the decision of the United States Army Court of Criminal Appeals.

### I. Senator McCain and Article 37(a), UCMJ

Article 37(a), UCMJ, protects courts-martial from outside interference in several ways. At the time of the events in question, the second sentence of this article read as follows:

> No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings

> or sentence in any case, or the action of any conven-
> ing, approving, or reviewing authority with respect
> to his judicial acts.

Article 37(a), UCMJ. I agree with the determination in Part II.A.1 of the lead opinion that this provision applied to Senator McCain because, as a military retiree, he was a "person[] . . . subject to this chapter." Article 2(a)(4), UCMJ, 10 U.S.C. § 802(a)(4). But I disagree with the determination in Part II.B.1 of the lead opinion that Appellant provided "some evidence" that Senator McCain violated this provision when he declared: "If it comes out that [Appellant] has no punishment, we're going to have to have a hearing in the Senate Armed Services Committee."

A close examination of the second sentence of Article 37(a), UCMJ, reveals that it contains two prohibitions. One is a proscription against "attempt[ing] to coerce . . . the action" of a convening authority or other listed persons who are not at issue here. Because the UCMJ does not define the term "coerce," we must assume that Article 37(a), UCMJ, and other provisions in the UCMJ employ the term in accordance with its ordinary meaning.[1] *See United States v. Schloff*, 74 M.J. 312, 313 (C.A.A.F. 2015) ("In the absence of any specific statutory definition, we look to the ordinary meaning of the word."). *Black's Law Dictionary* defines "coerce" to mean "compel by force or threat" and defines "threat" to mean "a communicated intent to inflict harm or loss on another or another's property." *Black's Law Dictionary* (11th ed. 2019) (entries for "coerce" and "threat"). Definitions from other dictionaries are similar.[2] In this case, the military judge found that "[n]either Senator McCain, nor anyone else, has threatened or otherwise tried to forcefully influence [the convening authority's] decisions in this case." Appellant does not contend that this finding of fact is clearly erroneous. Senator McCain

---

[1] The terms "coercion" and "coerce" also appear in Articles 31(d) and 120(g)(4)(c), UCMJ, 10 U.S.C. §§ 831(d), 920(g)(4)(c), respectively.

[2] *See, e.g.*, 1 *Shorter Oxford English Dictionary* 442 (5th ed. 2002) (defining "coerce" to mean "[f]orcibly constrain or impel"); *Webster's Third New International Dictionary, Unabridged* 439 (1986) (defining "coerce" to mean "compel to an act or choice by force, threat, or other pressure").

therefore did not violate the second sentence of Article 37(a), UCMJ, by attempting to "coerce" the convening authority when he stated the need for a hearing if Appellant received no punishment.

The other prohibition in the second sentence of Article 37(a), UCMJ, is a proscription against attempting "by any unauthorized means [to] influence the action" of a convening authority or other listed persons not relevant here. In applying this provision, the question is whether Senator McCain's statement that a Senate committee will hold a hearing if Appellant receives no punishment was "some evidence" of both (a) an attempt "to influence the action" of the convening authority, and (b) an "unauthorized means" of doing so. Based on the Supreme Court's holdings with respect to Congress's power to investigate and the military judge's findings of fact, the answer to this question is no.

The Supreme Court has recognized that Article I of the Constitution implicitly grants Congress authority to gather information necessary for intelligently exercising its enumerated powers. The Supreme Court has explained:

> The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste.

*Watkins v. United States*, 354 U.S. 178, 187 (1957)*; see also Eastland v. U.S. Servicemen's Fund,* 421 U.S. 491, 504 (1975) ("[T]he power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" (second alteration in original) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927))); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("The scope of [Congress's] power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitu-

tion."). The Supreme Court further has recognized that Congress may delegate its constitutional investigative powers to committees and subcommittees, such that they "are endowed with the *full power* of the Congress to compel testimony." *Watkins*, 354 U.S. at 201 (emphasis added); *see also Eastland* 421 U.S. at 505. And holding or proposing to hold "embarrassing oversight hearings" is one common way that Congress ensures that Executive Branch officers do not abuse their discretion in implementing federal law. Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2258 (2001).

To be sure, Congress's power to investigate, including its power to hold hearings, is not unlimited. The Supreme Court has indicated that congressional investigations "must be related to, and in furtherance of, a legitimate task of the Congress." *Watkins*, 354 U.S. at 187. Similarly, the Supreme Court has said that Congress cannot hold hearings solely "to expose the private affairs of individuals without justification in terms of the functions of the Congress." *Id.* The Supreme Court has also asserted that investigations "conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* And the Supreme Court has declared that Congress's investigative powers are limited to legislative concerns, explaining: "Congress [is not] a law enforcement or trial agency." *Id.* But the Supreme Court has never held that Congress is disabled from investigating executive and judicial responses to criminal conduct.[3]

In this case, Appellant argues that Senator McCain's statement that the Senate Armed Services Committee would have to hold a hearing if Appellant received no punishment crossed the line between the authorized and the unauthorized because it was a "blatant threat to the fair administration of military justice" and it served to "ensure that punishment ensued." If the military judge's findings of fact supported these arguments, they might warrant further inquiry even

---

[3] Congress, indeed, often investigates the federal response to alleged criminal conduct. A prominent example in the military context involved is discussed in *United States v. Calley*, 46 C.M.R. 1131, 1138 (A.C.M.R. 1973).

though they do not fit neatly within the categories of exceptions to Congress's investigative powers that the Supreme Court previously has identified. But the military judge did not find that Senator McCain had threatened the fair administration of justice or that his comments ensured that Appellant would receive punishment. On the contrary, the military judge found that even though Senator McCain had considerable power as the chair of the Senate Armed Service Committee "there is absolutely no evidence that he has attempted or threated to use any such power to control the discretion of those in SGT Bergdahl's military justice chain of command." The military judge further found that "[n]either Senator McCain nor members of his staff have ever even attempted to contact" the convening authority or members of his staff. The military judge also found that Senator McCain's intention was not to influence the trial but was instead "political posturing designed to embarrass a political opponent (President Obama) and gain some political advantage." And consistent with these findings, the military judge found that the convening authority "was not affected by [Senator McCain's] comments and did not consider them in making his decision as to the disposition of the charges against SGT Bergdahl." These findings are all findings of fact, and we must accept them unless they are clearly erroneous.[4] Here, Appellant has not argued that any of military judge's findings are clearly erroneous.

Based on these findings of fact, I agree with the military judge's legal conclusion that Senator McCain did not attempt to influence the court-martial by unauthorized means in violation of Article 37(a), UCMJ. The military judge correctly reasoned:

> Certainly it is true that, as [Senator McCain] said, he could hold hearings at the [Senate Armed Services Committee]; as the Chairman, that is certainly his prerogative. But, such hearings are designed to

---

[4] For comparison, *see, e.g.*, *McDonnell v. United States*, 136 S. Ct. 2355, 2371 (2016) (noting whether public official makes a quid pro quo agreement is a question for the trier of fact); *McCormick v. United States*, 500 U.S. 257, 270 (1991) (noting intent of state legislator in asking for money from constituents is a question for the trier of fact).

uncover malfeasance or malfeasance by public officials in the exercise of the public trust and are not a review or check on a particular court-martial. The [Senate Armed Services Committee] simply has [no] ability to oversee the trial of this case in particular or trials by court-martial in general. They can certainly hold hearings, gather information and draft and submit changes to the UCMJ to the [C]ongress for vote. However, such changes would be: 1) Prospective and 2) Not tied to or effecting [sic] a particular case that has already been disposed of. *The defense has simply failed to provide some evidence which, if true, would constitute* [*unlawful command influence*] *which would have a logical connection to this court-martial in terms of potential to cause unfairness in the proceedings.*

Emphasis added.

Perhaps Appellant could have developed additional facts at trial that might support his arguments. But we have no authority to find additional facts at this stage of the proceedings. Accordingly, based on the absence of findings of fact necessary to support Appellant's theory that Senator McCain's statements constituted an attempt by unauthorized means to influence the convening authority, Appellant has failed to "show 'some evidence' that unlawful command influence occurred." *Boyce*, 76 M.J. at 249 (citation omitted).

## II. President Trump and R.C.M. 104(a)(1)

I agree with the lead opinion that Article 37(a), UCMJ, did not apply to President Trump, either before or after he assumed office.[5] But I disagree with the lead opinion's determi-

---

[5] The various limitations in Article 37(a), UCMJ, apply to an "authority convening a general, special, or summary court-martial," a "commanding officer," and a "person subject to this chapter [i.e., subject to the UCMJ]." President Trump was not an authority convening a court-martial because he did not convene a court-martial. President Trump was not a commanding officer because Article 1(3), UCMJ, 10 U.S.C. § 801(3), defines that term to "include[] only commissioned officers," which President Trump was not. And unlike Senator McCain, President Trump was not a person subject to the UCMJ because he was not an active or retired member of the military and did not fit within any of the other classes of persons listed Article 2(a)(1), UCMJ.

nation in Part II.A.2 that R.C.M. 104(a)(1) applied to President Trump. At the relevant times, R.C.M. 104(a)(1) read as follows:

> No *convening authority* or commander may censure, reprimand, or admonish a court-martial or other military tribunal or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court-martial or tribunal, or with respect to any other exercise of the functions of the court-martial or tribunal or such persons in the conduct of the proceedings.

Emphasis added.

The parties disagree about whether the term "convening authority" in R.C.M. 104(a)(1) covers President Trump. Appellant contends that the term includes President Trump because he has the power to convene a general court-martial. The Government argues that the term includes only the person who actually convened the specific court-martial at issue, which in this case was General Abrams, not President Trump. Neither party has identified any precedent that directly answers this question about the meaning of "convening authority" in R.C.M. 104(a)(1).

The lead opinion sides with Appellant, relying on Article 22(a)(1), UCMJ, 10 U.S.C. § 822(a)(1), which provides that "[g]eneral courts-martial may be convened by . . . the President of the United States." But Article 22(a)(1), UCMJ, does not answer the issue disputed by the parties. The interpretive question is whether the term "convening authority" in R.C.M. 104(a)(1) refers to the authority who actually convened the court-martial at issue or instead refers more broadly to anyone who has the power to convene a court-martial. Article 22(a)(1), UCMJ, does not resolve this issue because it merely says that the President is a person who *may* convene a court-martial. If the term "convening authority" in R.C.M. 104(a)(1) means only the authority who actually convened the specific court-martial at issue, then Article 22(a)(1), UCMJ, is irrelevant because President Trump did not convene this court-martial, even though he had the power to do so.

In my view, the answer to the disputed issue lies in recognizing the important "principle that a text does include not only what is express but also what is implicit." Antonin Scalia

& Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 96 (2012). As Justice Antonin Scalia and Professor Bryan Garner have explained, "[a]dhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text. . . . The full body of a text contains implications that can alter the literal meaning of individual words." *Id.* at 356. In this case, each party is essentially arguing that R.C.M. 104(a)(1) contains implicit qualifiers. Appellant believes that the term "convening authority" implicitly means *a person empowered to act as a* convening authority, whereas the Government believes the term implicitly means the convening authority *in the specific case at issue*. The lead opinion effectively reads the qualifier advocated by Appellant into the text of the rule. But in my view, while either proposed implicit qualifier is linguistically possible, the Government has the stronger argument about which qualifier is implied in R.C.M. 104(a)(1).

Most of the Rules for Courts-Martial are implicitly limited in their application to the specific court-martial at issue. For example, when R.C.M. 802(c) states that "[n]o party may be prevented . . . from presenting evidence or from making any argument, objection, or motion at trial," the fair meaning is that no party *in the specific case at issue* shall be prevented from presenting evidence or making argument at trial *in the specific case at issue* even though the words "in the specific case at issue" are not expressly stated. Without these implicit qualifiers, R.C.M. 802(c) would afford a party to *any* court-martial the right to present evidence and make argument in *any* other court-martial. Likewise, when R.C.M. 705(e) provides that "no member of a court-martial shall be informed of the existence of a pretrial agreement," the fair meaning is that no member *in the specific case at issue* shall be informed of a pretrial agreement *in the specific case at issue* even though the words "in the specific case at issue" are not expressly stated. Without these implicit qualifiers, R.C.M. 705(e) would prevent a commander who had once served as a member of *any* court-martial from ever afterward seeing or negotiating a pretrial agreement in *any* other court-martial. Similarly, when R.C.M. 502(a)(2) provides that "[n]o member may use rank or position to influence another member," the fair meaning is that no member *in the specific case at issue*

may use rank to influence another member *in the specific case at issue* even though the words "in the specific case at issue" are not expressly stated. Otherwise, R.C.M. 502(a)(2) would prevent a senior officer who has once served as a member in *any* court-martial from ever again giving orders to a junior officer who has ever served as a member in *any* court-martial. In each of these rules, the implied qualifiers likely were not stated expressly because they would be apparent to anyone without mentioning and because adding "in the specific case at issue" to every clause of every rule would make the Rules for Courts-Martial intolerably cumbersome to read.

In the same way, when R.C.M. 104(a)(1) provides that "[n]o convening authority . . . may censure, reprimand, or admonish . . . any . . . military judge," I believe that the fair meaning is that no convening authority *in the specific case at issue* may censure, reprimand, or admonish any military judge *in the specific case at issue* even though R.C.M. 104(a)(1) does not expressly state the words "in the specific case at issue."[6] These implicit qualifiers harmonize R.C.M. 104(a)(1) with the other rules discussed above (which are worded very similarly) and with the general principle that the Rules for Courts-Martial are implicitly limited in their application to the specific court-martial at issue. The implicit qualifiers also harmonize R.C.M. 104(a)(1) with Article 37(a), UCMJ, which all agree applies only to the convening authority who actually convened the specific court-martial at issue. *See* Scalia & Garner, *supra*, at 252 ("[L]aws dealing with the same subject—being *in pari materia* (translated as 'in a like matter')—should if possible be interpreted harmoniously.").[7]

---

[6] A court-martial could have more than one convening authority if, for example, the original court-martial convening authority is reassigned and successor takes over. *See* R.C.M. 103(6) ("'Convening authority' includes a commissioned officer in command for the time being and successors in command.").

[7] In *Russello v. United States*, the Supreme Court cited the familiar and uncontroversial principle that a difference in the wording of two sections of "the same Act" presumably gives the two sections different meanings. 464 U.S. 16, 23 (1983) (internal quotation marks omitted) (citation omitted). This principle, however, is not

This reading also strikes me as being much more plausible than the one asserted by Appellant. If "no convening authority" implicitly means no *person empowered to act as a* convening authority, and is not implicitly limited to the convening authority in the specific case at issue, then R.C.M. 104(a)(1) would have an astonishingly broad scope. For instance, it would cover not just the President of the United States, but also every junior officer in any service stationed anywhere in the world who is designated as a summary court-martial convening authority. *See* Article 24(a), UCMJ, 10 U.S.C. § 824(a). While the President might have authority to promulgate a rule so much broader in scope than Article 37(a), UCMJ, it is difficult to believe that he would do so implicitly. For these reasons, between the two proposed interpretations of the term "convening authority," the one proposed by the Government is objectively more reasonable.

### III. Conclusion

Because of my disagreements with the lead opinion's determinations with respect to both Senator McCain and President Trump, I do not join Parts II.A. or II.B. of the lead opinion. While my conclusions above would suffice to decide this case if they had the support of the majority of the Court, they do not. I therefore join Part II.C. of the lead opinion based on the assumptions that, *even if* Appellant had shown some evidence that Senator McCain *had* violated Article 37(a), UCMJ, and *even if* R.C.M. 104(c) *did* apply to the President, the statements at issue would not, within the meaning of *Boyce,* have "place[d] an intolerable strain upon the public's perception of the military justice system." *Boyce*, 76 M.J. at 252.

---

apt when comparing the wording of a congressionally enacted statute like Article 37(a), UCMJ, to the wording of a presidentially promulgated procedural rule like R.C.M. 104(a)(1), because the article and rule are in different texts. Instead, the wording of R.C.M. 104(a)(1) should be compared to other similarly worded Rules for Courts-Martial, which as shown above generally contain an implied limitation restricting their application to the specific case at issue. Because R.C.M. 104(a)(1) differs little from those other rules, it presumably also carries the same implied limitation.